**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
pelton@peltongraham.com
Taylor B. Graham (TG 9607)
graham@peltongraham.com
Kristen E. Boysen (KB 0208)
boysen@peltongraham.com
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiff and the putative*
*FLSA Collective*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ANTONIO AMIGON, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>-against-<br><br>**SAFEWAY CONSTRUCTION ENTERPRISES LLC and STEVEN CESTARO, Jointly and Severally,**<br><br>**Defendants.** | **COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Antonio Amigon ("Amigon" or "Plaintiff"), individually and on behalf of all others similarly situated, as collective representative, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff is a former backhoe operator who worked for Defendants on New York City public streets, roadways and sidewalks, pursuant to contracts with Consolidated Edison

1

Company of New York, Inc. ("Con Ed") and New York City and/or New York State public entities.

2.      Throughout the relevant time period, Plaintiff was not paid the applicable prevailing rate of wages or supplemental benefits for all hours that he worked on excavation projects on New York City public streets, roadways and sidewalks. Further, Plaintiff was not paid wages of any kind for time spent traveling between job sites and Defendants' yard and for time spent working in Defendants' yard, resulting in significant unpaid regular and overtime wages each week.

3.      Plaintiff brings this action to recover overtime premium pay owed to him pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq.*  Plaintiff also seeks to recover unpaid prevailing wages, daily overtime and supplemental benefits which he was entitled to receive for work he performed pursuant to contracts entered into between Defendants and Con Ed and/or New York City or New York State public entities, which required payment of prevailing wages.

4.      Plaintiff also brings claims for unpaid wages pursuant to NYLL §§ 190 & 193 and for Defendants' failure to provide proper wage notices and wage statements pursuant to NYLL §§ 190 *et seq*.

5.      Plaintiff brings his FLSA claims on behalf of himself and all other similarly situated employees of Defendants and his NYLL and New York common law claims on behalf of himself and any individuals who opt-in to this action pursuant to §216(b) of the FLSA (the "Opt-in Plaintiffs").

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337

and 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district.

9.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.      On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020.

## THE PARTIES

**Plaintiff:**

11.     Plaintiff Amigon was, at all relevant times, an adult individual residing in Kings County, New York.

12.     Throughout the relevant time period, Plaintiff performed work for Defendants on New York City public streets, roadways and sidewalks.

13.     Plaintiff consents in writing to be party to this action, pursuant to 29 U.S.C. § 216(b), and his consent form is attached hereto.

**Defendants:**

14.     Defendant Safeway Construction Enterprises LLC ("Safeway" or the "Corporate Defendant") is an active Delaware limited liability company doing business at 54-60 44th Street, Maspeth, New York 11378.

15.     At all relevant times, the Corporate Defendant has been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

16.     Upon information and belief, at all relevant times, the Corporate Defendant had gross revenues in excess of $500,000.00.

17.     Upon information and belief, Steven Cestaro ("Cestaro" or the "Individual Defendant" and, together with the Corporate Defendant, the "Defendants") is an owner and operator of Safeway who sets the company's payroll policies, including the unlawful practices complained of herein.

18.     Upon information and belief, throughout the relevant time period, the Individual Defendant was in charge of determining Safeway's policies with respect to payroll and otherwise

running the business of Safeway.

18.     The Individual Defendant participated in the day-to-day operations of Safeway and acted intentionally in his direction and control of Plaintiff and Safeway's other similarly situated employees and is an "employer" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations thereunder, 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and is jointly and severally liable with the Corporate Defendant.

19.     Plaintiff Amigon observed Defendant Cestaro on the job sites on approximately a weekly basis supervising employees, interacting with Safeway foremen and supervisors, speaking with various Con Ed employees, including Con Ed inspectors "David," "Luis" and "Mike," when Amigon performed work on Con Ed job sites, reviewing blueprints and ensuring that the work was being performed correctly and on the proper time schedule. On numerous occasions, Plaintiff Amigon observed Defendant Cestaro bringing employees' payments to the Safeway yard, located at 54-60 44th Street, Maspeth, NY 11378 (hereinafter the "Maspeth Yard"). Upon information and belief, Defendant Cestaro signed employees' paychecks. Plaintiff Amigon was hired by Defendant Cestaro.

20.     Upon information and belief, "Paul" and "Ralph Phillip" are supervisors at Safeway. Upon information and belief, Defendant Cestaro is in constant contact with "Paul, "Ralph Phillip" and Defendants' other supervisors and foremen to ensure that the company is operating in accordance with his standards and policies.

21.     At all relevant times, Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a). At all relevant times, Defendants employed, and/or continue to employ, Plaintiff and each of the Collective Action members within the meaning of

the FLSA.

22.     At all relevant times, Plaintiff was employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

## FLSA COLLECTIVE ACTION ALLEGATIONS

23.     Pursuant to 29 U.S.C. §§ 207 & 216(b), Plaintiff brings his First Cause of Action as a collective action under the FLSA on behalf of himself and the following collective:

> All persons employed by Defendants at any time since October 29, 2017 and through the entry of judgment in this case (the "Collective Action Period") who worked as operators (the "Collective Action Members").

24.     A collective action is appropriate in this circumstance because Plaintiff and the Collective Action Members are similarly situated, in that they were all subjected to Defendants' illegal policies of failing to pay overtime premiums for work performed in excess of forty (40) hours each week, including time spent working in Defendants' yard and time spent traveling between the yard and the job sites. As a result of these policies, Plaintiff and the Collective Action Members did not receive overtime premium payments for all hours worked in excess of forty (40) hours per week.

25.     Plaintiff and the Collective Action Members have substantially similar job duties and were paid pursuant to a similar, if not the same, payment structure.

## STATEMENT OF FACTS

**Defendants' Company**

26.     At all relevant times, Safeway has been in the site development and utilities contracting business. Specifically, Safeway performs underground installation, repairs, upgrades and maintenance of gas, electrical, water, steam and telecommunications infrastructure throughout the New York metropolitan area.

27.     Defendant Safeway Construction Enterprises LLC was registered with the New York State Department of State, Division of Corporations on August 23, 2016.

28.     According to the website for Safeway:

Safeway Construction Enterprises is a site development and utilities contractor serving municipalities and private sector construction companies and developers in the greater New York metropolitan area.

Among the fewer-than-ten contractors certified by ConEd to work with live gas, Safeway was one of the first site development companies to respond when the Twin Towers were attacked on 9/11. Areas of expertise include:

Underground installation, replacement and repair services relating to gas, water, steam, electrical conduit, and telecommunications transmission; Installing both precast and custom field-constructed vaults, service boxes, manholes, castings, and other utility structures; Consulting services including cost estimating, all phases of construction management, and administrative support; Trenchless technology completion without any disturbance to other utilities; Rental of new, ConEd-certified equipment.

Dense urban locales like midtown Manhattan are common work zones for Safeway. We adhere rigorously to best health and safety practices to protect the health and safety of our workers and others who come into the proximity of our worksites.

http://www.safewayce.com/aboutus.html.

29.     At all relevant times, the Individual Defendant has been in charge of the day-to-day operations of Safeway including, among other things, hiring and firing employees, and setting the schedules and wage rates of employees.

30.     Upon information and belief, at all relevant times, the Individual Defendant handled the operations of Safeway's business and gave direction to Safeway's supervisors and foremen to ensure that the work was being conducted in accordance with his policies and procedures, including the policies complained of herein.

**The Public Works Contracts**

31.     Upon information and belief, Safeway has entered into certain contracts, as either

7

a subcontractor or prime contractor, with Con Ed and New York City and/or New York State public entities to provide excavation work on New York City and New York State public streets, roadways and sidewalks, or with prime contractors not currently known, to furnish labor, material and equipment to perform work on New York City and New York State public roadways and sidewalks (the "Public Works Contracts").

32.     Upon information and belief, the Public Works Contracts obligated Defendants to pay Plaintiff at or above the local prevailing wage rates, including any required supplemental benefits and overtime premiums for hours worked in excess of forty (40) hours per week, eight (8) hours per day, hours worked on Saturday and Sunday and hours worked during the evening.

33.     For work performed on Con Ed job sites, the "labor" provision of the Con Edison Standard Terms and Conditions for Construction Contracts ("Con Ed Contract Terms") provides in pertinent part:

> Where Contractor employs workers on sites where a permit to use or open a street (including excavating the street) is required and New York City Administrative Code Section 19-142, or its successor (or a similar law, regulation, or code pertaining to sites located outside of New York City ("Similar Local Law")) is applicable, Contractor agrees that pursuant to and in furtherance of the requirements of New York City Administrative Code Section 19-142, or its successor, (or the requirements of the Similar Local Law) and the terms and conditions of the permit: none but competent workers, skilled in the work required of them, shall be employed thereon; the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the Comptroller of the City of New York pursuant to Section 220 of the New York State Labor Law (or as established by such other fiscal officer, as specified in Section 220 of the New York State Labor Law, for workers on permitted sites located outside of New York City to which a Similar Local Law applies), paid to those so employed, and Contractor shall pay that prevailing wage to workers so employed.

34.     Upon information and belief, the Con Ed Contract Terms, including the labor provision requiring payment of prevailing wages, were incorporated into all of the contracts between Safeway and Con Ed to provide excavation work on New York City and New York State

public streets, roadways and sidewalks.

35.     As an employee of Defendants who was assigned to work on Defendants' excavation projects, Plaintiff was an intended third-party beneficiary of the Public Works Contracts.

36.     Upon information and belief, each project which involved street opening upon which Safeway performed work pursuant to the Public Works Contracts in New York City required a Street Opening Permit issued by the NYC Department of Transportation ("DOT"). The Street Opening Permit included various stipulations for the work that was being performed, including, but not limited to, stipulations regarding the wages that were to be paid to all workers on the excavations. Specifically, the permits provided:

> WAGE01  NYC ADMINISTRATIVE CODE, 19-142, WORKERS ON EXCAVATIONS: A PERSON TO WHOM A PERMIT MAY BE ISSUED, TO USE OR OPEN A STREET, SHALL BE REQUIRED, BEFORE SUCH PERMIT MAY BE ISSUED, TO AGREE THAT NONE BUT COMPETENT WORKERS, SKILLED IN THE WORK REQUIRED OF THEM, SHALL BE EMPLOYED THEREON, (CONT. ON STIP WAGE02)
>
> WAGE02  ...AND THAT THE PREVAILING SCALE OF UNION WAGES SHALL BE THE PREVAILING WAGE FOR SIMILAR TITLES AS ESTABLISHED BY THE FISCAL OFFICER PURSUANT TO SEC. TWO HUNDRED TWENTY OF THE LABOR LAW, PAID TO THOSE SO EMPLOYED.

37.     As required by law, a schedule containing the prevailing rates of wages and supplemental benefits ("prevailing wage schedules") to be paid to Plaintiff and Defendants' other operating engineers should have been annexed to and formed a part of the Public Works Contracts. If not annexed to the Public Works Contracts, these schedules were expressly or impliedly incorporated into the contracts as a matter of law and/or public policy.

38.     The promise to pay and ensure payment of the prevailing wage and supplemental

benefit rate stated in the Public Works Contracts was made for the benefit of all workers furnishing labor on New York City and New York State public roadways and sidewalks, and, as such, the workers furnishing labor on New York City and New York State public roadways and sidewalks are the beneficiaries of that promise and the contracts entered into by Defendants with Con Ed and New York City and/or New York State public entities.

39.     In furtherance of the Public Works Contracts entered into by Defendants, Plaintiff operated a backhoe to dig up portions of New York City streets and move debris, among other tasks.

**Plaintiff's Work for Defendants**

40.     <u>Plaintiff Amigon</u> worked for Defendants as a backhoe operator from in or around February 2017 through in or around December 2018 and again from in or around March 2019 through in or around January 2020 (collectively, the "Amigon Employment Period"). Throughout the Amigon Employment Period, Plaintiff Amigon performed work on New York City public streets and roadways, primarily in Manhattan.

41.     From the start of the Amigon Employment Period through in or around December 2018, Plaintiff Amigon typically worked five (5) days per week, Monday through Friday, from approximately 7:00 am to 3:30 pm on the job sites to which he was assigned, for a total of approximately forty-two and one-half (42.5) hours per week, including breaks, but not including time spent working at the Maspeth Yard or travel time. Throughout the Amigon Employment Period, Plaintiff Amigon was generally able to take a fifteen (15)-minute coffee break in the morning and a thirty (30)-minute break for lunch.

42.     From in or around December 2018 through in or around February 2019, Plaintiff Amigon was not scheduled to perform work for Safeway. After he had gone several weeks without

a job assignment, Plaintiff Amigon contacted Defendant Cestaro directly to ask why the company was not calling him to work. During this conversation, Defendant Cestaro assured Plaintiff Amigon that "everything was fine" with the company and that Plaintiff Amigon had not done anything wrong. Shortly after this conversation, the company began assigning Plaintiff Amigon more shifts. However, from in or around March 2019 through the end of the Amigon Employment Period, Plaintiff Amigon was not scheduled to work nearly as consistently as he was during his first period of employment. For example, while he began working approximately four (4) days per week when he was called back to work in or around March 2019, Defendants began decreasing his hours gradually such that he worked, on average, one (1) weekday shift towards the end of his employment with Safeway.

43.     From in or around March 2019 through the end of the Amigon Employment Period, Plaintiff Amigon continued to work his regular schedule of approximately 7:00 am to 3:30 pm on the job sites to which he was assigned.

44.     Throughout the Amigon Employment Period, Plaintiff Amigon was required to arrive at the Maspeth Yard at 6:00 am, and sometimes as early as between 5:00 am and 5:30 am, to receive a job assignment, speak with his supervisors to finalize any details necessary to complete the work and perform a variety of tasks related to checking the condition of the backhoe to which he was assigned in order to avoid hazards while traveling to the job sites or working on the job sites themselves. For example, each morning, Plaintiff Amigon was required to ensure that the backhoe was full of diesel fuel, ensure that the tires were sufficiently full and check the air pressure, check the engine oil and hydraulic oil levels, ensure that the data plate and load rating plates were fitted and readable, check to make sure that the machine did not have any damage to the boom or arms or any leaks in the hydraulics, verify that the coolant level for the machine was

correct depending on the season, verify that the battery bracket and terminals were secure and clean, ensure that his seat rotated properly and verify that he was able to engage the controls. Plaintiff Amigon was not permitted to leave the Maspeth Yard unless the backhoe was in perfect operating condition. On average, this inspection took approximately thirty (30) minutes.

45.     After inspecting the backhoe and ensuring that it met the necessary operating standards, Plaintiff Amigon drove the machine to his first job site for the day. In general, Plaintiff Amigon arrived at the first site to which he was assigned at approximately 7:00 am.

46.     Throughout the Amigon Employment Period, Plaintiff Amigon typically received a document containing the various locations to which he was assigned to work from one his supervisors in the Maspeth Yard in the morning. Plaintiff Amigon was sometimes required to report to two to three (2-3), and sometimes as many as five (5) job sites during a single workday.

47.     Regardless of job site he worked on, Plaintiff's job duties on the construction site remained consistent.

48.     Throughout the Amigon Employment Period, Plaintiff Amigon was required to return the backhoe to the Maspeth Yard at the end of the workday and prepare a report of every job site on which he performed excavation work, the hours that he worked for the day and the amount of soil excavated on the job sites. At the end of each workday, Plaintiff Amigon was required to drop the report in a small box in the Maspeth Yard.

49.     Throughout the Amigon Employment Period, Plaintiff Amigon and Defendants' other construction employees were routinely instructed by various Safeway and Con Ed supervisors to fill in only the hours that they performed work on job sites (i.e., typically 7:00 am to 3:30 pm) on their time reports, despite the fact that they performed substantial work in the Maspeth Yard and were required to travel between the job sites and the Maspeth Yard.

12

50.     In 2017 and 2018, Plaintiff Amigon was occasionally assigned to work on certain "per diem" contracts entered into between Safeway and Con Ed. If he was required to perform work pursuant to one of these contracts, he typically drove the backhoe to a Con Ed yard, located at 110th Street, between 1st and 2nd Avenues in Manhattan, after performing the regular inspection of the machine at the Safeway Maspeth Yard. On days when Plaintiff Amigon was required to perform work pursuant to one of the "per diem" contracts with Con Ed, he typically received his specific job site and crew assignments from a Con Ed supervisor or foreman. When Plaintiff Amigon completed the work that he was assigned for the day, he was required to return to the Maspeth Yard with the backhoe.

51.     Throughout the Amigon Employment Period, Plaintiff Amigon was only paid wages for time working on job sites and did not receive wages of any kind of time spent at the Maspeth Yard, receiving job assignments, inspecting the backhoe and preparing reports of the job sites on which he worked and the hours he worked each day, or for time spent traveling between the Maspeth Yard and the job sites.

52.     While Plaintiff Amigon was required to input the hours that he worked on the job sites in a report of the locations where he performed work with the backhoe, throughout the Amigon Employment Period, Defendants did not maintain a timeclock or any other formal timekeeping system to keep track of the hours that Plaintiff Amigon and Defendants' other employees spent working in the Maspeth Yard or traveling between the Maspeth Yard and the job sites.

53.     Throughout the Amigon Employment Period, Plaintiff Amigon was a member of the Local 731 Laborers' Union (hereinafter "Local 731").

54.     For his work, Plaintiff Amigon was paid the Local 731 base and benefit rates

throughout the duration of his employment with Defendants. From the beginning of the Amigon Employment Period to in or around June 2018, Plaintiff Amigon was paid $41.35 per hour for all regular hours for which he received compensation, and approximately $62.03 for all overtime hours,[1] for which he received compensation, not including time spent in the Maspeth Yard or traveling between the Maspeth Yard and the job sites.

55.    From in or around July 2018 through in or around June 2019, Plaintiff Amigon was paid $41.85 for all regular hours for which he received compensation, and approximately $62.76 for all overtime hours,[2] for which he received compensation, not including time spent in the Maspeth Yard or traveling between the Maspeth Yard and the job sites.

56.    From in or around July 2019 through the end of the Amigon Employment Period, Plaintiff Amigon was paid $42.50 for all regular hours for which he received compensation, and $63.75 for all overtime hours for which he received compensation, not including time spent in the Maspeth Yard or traveling between the Maspeth Yard and the job sites.

57.    Throughout the Amigon Employment Period, Plaintiff Amigon received certain benefits that were part of his Local 731 union package.

58.    Although Amigon was paid Local 731 rates throughout his employment with Defendants, and thus was paid the union rates for a laborer, as an operator, upon information and belief, Plaintiff should have been paid at the prevailing rate of wages (including supplemental benefits) of:

      a.    July 1, 2017 through June 30, 2018:  $65.31, plus $36.87 in supplemental benefits, per hour;[3]

---

[1] The overtime rate that appears on certain paystubs in Amigon's possession during this time period is $62.0250.
[2] The overtime rate that appears on certain paystubs in Amigon's possession during this time period is $62.7750.
[3] The rates listed are those of an "Engineer – Heavy Construction Operating Engineer II" from the Office of the Comptroller, City of New York's § 220 Prevailing Wage Schedules.

b.      July 1, 2018 through June 30, 2019: $66.92, plus $38.28 in supplemental

benefits, per hour;

c.      July 1, 2019 through June 30, 2020: $68.58, plus $39.74 in supplemental

benefits per hour.

59.     As an operating engineer, Plaintiff Amigon was informed by a shop steward,

Matthew Culhane ("Culhane"), whom Amigon knew as "Mateo," that he was supposed to become

a member of the International Union of Operating Engineers – Local 15 (hereinafter "Local 15")

after six (6) months of working for Safeway.

60.     In or around January 2018, Culhane sent Amigon certain text messages stating that

"sometime next week, you will be put on permit with Local 15" and instructing him to report to

the Local 15 training center, located at 160-50 Lefferts Boulevard in Jamaica, Queens on January

18, 2018 to "get put on permit." It was Amigon's understanding that he and approximately five (5)

other Safeway backhoe operators were to meet with certain union members of Local 15 who were

employed by Safeway, as well as certain representatives from Local 15 in order to get information

about how to become members of Local 15.

61.     On January 17, 2018, Culhane texted Amigon to tell him that the meeting had been

canceled, with no further explanation. Approximately two (2) months after the meeting was

supposed to take place, Amigon found out from two (2) other Safeway employees who were part

of the original group that Culhane had contacted about becoming members of Local 15 that they

had already been admitted to Local 15. These employees encouraged Amigon to push the company

to include him in Local 15, as it was their opinion that that was the appropriate union for him as

an operator and because it was Amigon's 'right' to be paid the correct wages.

62.     Amigon later heard from coworkers that Safeway had declined to admit certain of

the company's backhoe operators, including him, into Local 15 because it would be "too expensive" for the company. While the company assured Amigon and the other operators that it would try to "work something out" such that they could be admitted at a later date, Amigon continued to be paid at the Local 731 laborer rates throughout the duration of his employment with Defendants.

63. From the start of the Amigon Employment Period to in or around early 2018, Plaintiff Amigon was paid via a payroll check, which he typically received from Safeway office employees. Starting in or around late 2017 or early 2018, Plaintiff Amigon was paid via direct deposit and was able to access his paystubs through an online employee portal.

64. Because Plaintiff's paystubs only accounted for time worked on job sites and did not include time spent at the Maspeth Yard or traveling between the Maspeth Yard and the job sites, the wage statements that Amigon received did not show an accurate accounting of all hours that he had worked during the workweek.

65. Plaintiff did not receive a proper wage notice when he was hired and/or before a change of pay rate, as required by the NYLL, from Defendants at any point during the Relevant Time Period.

66. Defendants' failure to pay wages of any kind for time spent at the Maspeth Yard receiving job assignments, inspecting his machine, preparing reports of job locations and hours worked and traveling to and from job sites, and overtime premiums of one and one-half (1.5) times the regular hourly rate for all hours worked in excess of forty (40) per week was a corporate policy that applied to all machine operators employed by Defendants.

67. Both Safeway and Cestaro have been Defendants in at least two (2) previous lawsuits relating to unpaid wages, such that they should have been aware that their pay practices

16

were unlawful. *See, e.g. Portilla v. Safeway Construction Enterprises, Inc*. (E.D.N.Y., No. 14 Civ.

6466); *Entsakua v. Safeway Construction Enterprises, Inc*., et al. (E.D.N.Y., No 18 Civ. 00895).

## FIRST CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME
### (Brought on Behalf of Plaintiff and the Collective Action Members)

68.     Plaintiff, on behalf of himself and the Collective Action Members, repeats and

realleges each and every allegation of the preceding paragraphs hereof with the same force and

effect as though fully set forth herein.

69.     Defendants violated the FLSA overtime rights of Plaintiff and the Collective Action

Members by failing to pay overtime premiums of one and one-half (1.5) times the employees'

regular hourly rates for all hours worked in excess of forty (40) hours per week.

70.     By failing to pay overtime at a rate not less than one and one-half times the regular

rate of pay for work performed in excess of 40 hours per week, Defendants have violated and

continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and

215(a)(2).

71.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA

within the meaning of 29 U.S.C. § 255(a).

72.     Defendants' failure to pay overtime caused Plaintiff and the Collective Action

Members to suffer loss of wages and interest thereon. Plaintiff and the Collective Action Members

are entitled to recover from Defendants their unpaid overtime premium compensation, damages

for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and

costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
## NEW YORK LABOR LAW – UNPAID OVERTIME
### (Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)

73.     Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

74.     Defendants violated the NYLL overtime rights of the Plaintiff and the Opt-in Plaintiffs by failing to pay overtime premiums consisting of one and one-half (1.5) times his regular hourly rates for all hours worked in excess of forty (40) hours per week.

75.     Defendants willfully violated Plaintiff's and the Opt-in Plaintiffs' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of pay for hours worked in excess of forty (40) each week, in violation of the NYLL and regulations promulgated thereunder.

76.     Defendants' failure to pay overtime premium compensation caused Plaintiff and the Opt-in Plaintiffs to suffer loss of wages and interest thereon. Plaintiff and the Opt-in Plaintiffs are entitled to recover from Defendants his unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PAY WAGES**
**(Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)**

77.     Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

78.     Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiff and the Opt-in Plaintiffs are entitled to be paid all their weekly wages "not later than seven calendar days after the end of the week in which wages are earned." Thus, Defendants violated NYLL §

191 by failing to pay Plaintiff and the Opt-in Plaintiffs all of their wages earned within the week such wages were due.

79.    Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employee," such as Plaintiff and the Opt-in Plaintiffs, that is not otherwise authorized by law or by the employee.

80.    By withholding wages and overtime compensation from Plaintiff and the Opt-in Plaintiffs, pursuant to NYLL § 193 and the cases interpreting same, Defendants made unlawful deductions in wages owed to Plaintiff and the Opt-in Plaintiffs.

81.    Defendants' failure to pay Plaintiff and the Opt-in Plaintiffs wages of any kind for time spent receiving job assignments, inspecting machinery, preparing reports of work performed and hours worked, and traveling between the Maspeth Yard and the job sites, violated NYLL §§ 191 and 193.

82.    Defendants' failure to comply with NYLL §§ 191 and 193 caused Plaintiff and the Opt-in Plaintiffs to suffer loss of wages and interest thereon. Plaintiff and the Opt-in Plaintiffs are entitled to recover from Defendants his unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq*.

**FOURTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – WAGE STATEMENT VIOLATIONS**
**(Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)**

83.    Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

84.    Defendants have willfully failed to supply Plaintiff and the Opt-in Plaintiffs a

proper wage statement as required by Article 6, § 195(3).

85.     Due to Defendants' violations of the NYLL, Plaintiff and the Opt-in Plaintiffs are entitled to recover from Defendants two hundred fifty dollars ($250.00) for each day that the violations occurred or continue to occur, or a total of five thousand dollars ($5,000), as provided for by NYLL §§ 198(1-d) liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

### FIFTH CAUSE OF ACTION
### NEW YORK LABOR LAW –WAGE NOTICE VIOLATIONS
### (Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)

86.     Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

87.     Defendants have willfully failed to supply Plaintiff  and the Opt-in Plaintiffs notice as required by Article 6, § 195, or before a change of pay rate, in English or in the language identified by Plaintiff and the Opt-in Plaintiffs as their primary language, containing Plaintiff's and the Opt-in Plaintiffs' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

88.     Due to Defendants' violations of the NYLL, Plaintiff and the Opt-in Plaintiffs are entitled to recover from Defendants fifty dollars ($50.00) for each day that the violations occurred

or continue to occur, or a total of five thousand dollars ($5,000.00), as provided for by NYLL, Article 6, § 198(1-b), liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)**

89.     Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

90.     Upon information and belief, the Public Works Contracts entered into by Defendants contained schedules of the prevailing rates of wages and supplemental benefits or reference to the NYLL provisions governing payment of prevailing wages to be paid to Plaintiff and the Opt-in Plaintiffs and the employees performing work pursuant to such contracts.

91.     Those prevailing rates of wages and supplemental benefits were made part of the Public Works Contracts for the benefit of the Plaintiff and the other employees performing work pursuant to such contracts. In the event that the contracts or agreements entered into failed to explicitly contain prevailing wage schedules, the prevailing wage requirements were supplemented as a matter of law, requiring Defendants to pay the Plaintiff and the Opt-in Plaintiffs prevailing wages, daily/weekly overtime and supplemental benefits for all work performed.

92.     Defendants' failure to pay Plaintiff and the Opt-in Plaintiffs at the correct prevailing wage rates for straight time, overtime, and supplemental benefits for work performed on Public Works Projects constituted a material breach of the contracts entered into directly or indirectly between Defendants, Con Ed and/or various public entities.

93.     As a result of Defendants' failure to pay Plaintiff and the Opt-in Plaintiffs at

prevailing wage rates, they are entitled to relief from Defendants for breach of contract under New York common law of contracts.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT & QUANTUM MERUIT
#### (Pled In The Alternative)
#### (Brought on Behalf of Plaintiff Amigon and the Opt-in Plaintiffs)

94.     Plaintiff, on behalf of himself and the Opt-in Plaintiffs, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

95.     Based on Defendants' failure to pay Plaintiff and the Opt-in Plaintiffs the appropriate prevailing wage rates, Defendants were unjustly enriched at the expense of Plaintiff and the Opt-in Plaintiffs.

96. Equity and good conscience require that Defendants pay restitution to Plaintiff and the Opt-in Plaintiffs.

97.     Upon information and belief, when Defendants entered into the contract, they agreed to pay the required prevailing wages, overtime, shift-differential and holiday premiums, and supplemental benefit rates of pay to Plaintiff and other employees who performed work pursuant to the contracts.

98.     Plaintiff and the Opt-in Plaintiffs provided valuable services to Defendants performing prevailing wage jobs for which Plaintiff and the Opt-in Plaintiffs expected compensation. Defendants knowingly accepted such services yet failed to pay Plaintiff and the Opt-in Plaintiffs the reasonable value of such services as defined by the New York State and New York City prevailing wage schedules.

99.     As a result of Defendants' failure to pay Plaintiff and the Opt-in Plaintiffs at prevailing wage rates on prevailing wage jobs and Defendants' corresponding unjust enrichment,

Plaintiff is entitled to relief from Defendants under New York's common law of unjust enrichment.

100.    As a result of Defendants' failure to pay Plaintiff the reasonable value of the valuable services they rendered, Plaintiff and the Opt-in Plaintiffs are entitled to relief from Defendants under New York's common law of quantum meruit.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and all other similarly situated Collective Action Members and Opt-in Plaintiffs, respectfully requests that this Court grant the following relief:

a.    Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiff and his counsel to represent the Collective Action Members;

b.    An order tolling the statute of limitations;

c.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL and New York Common Law;

d.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

e.    An award of compensatory damages as a result of Defendants' failure to pay overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

f.    An award of compensatory damages as a result of Defendants' failure to pay all wages to which Plaintiff is entitled, pursuant to the NYLL and supporting regulations;

g.    An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

h.    An award of liquidated damages for Defendants' failure to pay all wages to which Plaintiff is entitled, pursuant to the NYLL and supporting regulations;

i.    An award of two hundred fifty dollars ($250.00) for each day that the violations of NYLL, Article 6 § 195(3), pertaining to distribution of wage statements, occurred or continue to occur, or a total of five thousand dollars ($5,000.00), as provided for by NYLL, Article 6 § 198(1-d);

j.    An award of fifty dollars ($50.00) for each day that the violations of NYLL, Article 6 § 195(1), pertaining to distribution of wage notice, occurred or continue to occur, or a total of five thousand dollars ($5,000.00), as provided for by NYLL § 198(1-b);

k.    An award of monetary damages to be proven at trial for all unpaid prevailing wages, daily/weekly overtime and supplemental benefits owed to Plaintiff;

l.    An award of prejudgment and post-judgment interest;

m.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

n.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised by the complaint.

Dated: New York, New York
October 29, 2020

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiff and the putative FLSA Collective*

25

### CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Safeway Construction Enterprises and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages and minimum wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

Signature

Printed Name: Antonio Amigon

### CONSENTIMIENTO PARA SER UN DEMANDANTE

Por mi firma abajo yo autorizo la presentación y tramitación de una acción legal en mi nombre y representación en contra de Safeway Construction Enterprises y sus respectivos propietarios, gerentes, oficiales, directores, sucesores, predecesores, subsidiarias y afiliados para que me sean pagados las horas extras y los salarios mínimos tal como lo requieren las normas estatales y/o federales e igualmente autorizo la presentación de este consentimiento en la acción(es) con el fin de debatir la conducta ilegal. Yo autorizo ser nombrado como **demandante representativo** en esta acción legal para tomar decisiones en nombre de otros demandantes a quienes pueda concernir el resultado de este proceso, el método y la manera en cómo debe llevarse a cabo este litigio, y la decisión de llegar a un acuerdo dentro de la causa y todo lo que concierna a los honorarios profesionales y costas del proceso y cualesquiera otras decisiones relacionadas con este litigio. Yo entiendo que estaré representado por Pelton Graham LLC sin tener que pagar por adelantado costas u honorarios de abogados. Yo entiendo que, si los demandantes tienen éxito, los costos asumidos por los abogados en mi nombre serán deducidos inicialmente de la porción de mi acuerdo en una conciliación o como resultado de una sentencia en juicio. Yo entiendo que mis abogados podrán solicitar a la Corte que les sean retribuidos los honorarios y costas procesales por parte de los demandados en nombre mío. Yo entiendo que los valores de retención de los abogados podrán ser ya sea el monto recibido por parte de los demandados o el monto aproximado de 1/3 (33.33%) del total del acuerdo de conciliación o del valor obtenido a través de la sentencia (incluyendo honorarios), cual sea la suma más alta.

Firma

Nombre Escrito: Antonio Amigon

This is a complete and accurate translation of the English "Consent to Become a Party Plaintiff" form above.